John Meyer
P.O. Box 412
Bozeman, MT 59771
John@cottonwoodlaw.org
(406) 546-0149

*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA - BUTTE DIVISION

| | |
|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER; JOHN DOES 1-10, | Cause No: **CV-25-33-BU-TJC** |
| *Plaintiffs*, | CLASS ACTION |
| vs. | **COMPLAINT FOR DECLARATORY RELIEF** |
| CROSS HARBOR CAPITAL PARTNERS, LLC; CH SP ACQUISITION LLC, d/b/a SPANISH PEAKS MOUNTAIN CLUB; YELLOWSTONE MOUNTAIN CLUB LLC; LONE MOUNTAIN LAND COMPANY; MATT KIDD; MIKE DUCUENNOIS; RICH CHANDLER; RON EDWARDS; JON RAUCHWAY | |
| *Defendants* | |

**INTRODUCTION**

1.      The unincorporated resort town of Big Sky, Montana has been taken hostage by unscrupulous corporations, developers, and individuals that value money more than the law or the environment.

2.      Defendants have violated the Rackeeter Influenced and Corrupt Organizations ("RICO") Act by creating an enterprise with the common purpose of knowingly and unlawfully disposing of partially treated sewage to facilitate continued development of luxury houses and hotels in Big Sky, Montana. To accomplish this purpose, Defendants have had Plaintiff's staff and a contractor arrested, provided falsified data to federal and state investigators, provided falsified data to a federal jury, and knowingly and unlawfully disposed of treated sewage in ways that pose a risk to human health and impair waters of the United States.

**CLASS ACTION ALLEGATIONS[1]**

3.      Plaintiffs brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed Classes:[2]

      A.  Persons who paid a utility bill to Big Sky Water and Sewer District that included costs associated with *Cottonwood Envtl. L. Ctr., et. al. v. Edwards, et. al.*, 2:20-cv—00026-BMM.

---

[1] Plaintiff Cottonwood Environmental Law Center is alleging a RICO claim as an individual plaintiff and not as a class.
[2] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

B.  Persons who paid membership fees or dues to Defendant Spanish Peaks that included costs associated with *Cottonwood Envtl. L. Ctr., et. al. v. CH SP Acquisition LLC, d/b/a Spanish Peaks Mountain Club, et. al.*, 2:23-cv—000028-BMM.

C.  Persons who pay membership fees or dues to Defendant Yellowstone Club that include costs associated with *Cottonwood Envtl. L. Ctr. v. Yellowstone Mountain Club, LLC*, 2:23-cv-00026-BMM.

## PARTIES

4.    Plaintiff Cottonwood Environmental Law Center ("Cottonwood") is a nonprofit conservation organization dedicated to protecting the people, forests, water, and wildlife of the American West.

5.    Cottonwood and its members have suffered concrete financial losses as a result of Defendants' RICO violation, including but not limited to legal and expert witness costs. Cottonwood members that reside in Big Sky have been forced to pay increased utility bills to the Big Sky Water and Sewer District to cover the costs associated with Defendants' RICO violation.

6.     Plaintiff John Doe 1 pays utility bills to Big Sky Water & Sewer District and has suffered discrete concrete economic damages in the form of increased utility rates as a result of Defendants Edwards and Rauchway's misrepresentations to state and federal investigators and a federal jury.

7.    Plaintiff John Doe 2 has suffered discrete concrete economic damages in the form of increased member fees or dues paid to Defendant Spanish Peaks as a result of Defendants' actions that furthered the RICO violation alleged herein.

2

8.     Plaintiff John Doe 3 has suffered discrete concrete economic damages in the form of increased member fees or dues paid to Yellowstone Club as a result of Defendants' actions that furthered the RICO violation alleged herein.

9.     Defendant CrossHarbor Capital Partners LLC ("CrossHarbor") is an American investment firm, specializing in private equity, based in Boston, Massachusetts. Defendant CrossHarbor owns and operates Defendant Yellowstone Mountain Club LLC and Defendant Lone Mountain Land Company.

10.     Defendant Yellowstone Mountain Club LLC ("Yellowstone Club") is a 15,200 acre private residential, ski, and golf community located in the Big Sky area.

11.     Defendant CH SP Acquisition LLC d/b/a Spanish Peaks Mountain Club ("Spanish Peaks") is a residential, ski, and golf community located in the Big Sky area.

12.     Defendant Lone Mountain Land Company was formed by Defendant CrossHarbor to manage the planning, entitlement, building, marketing and sale of real estate in Big Sky, Montana, including Spanish Peaks.

13.     Defendant Matt Kidd is President of Defendant Lone Mountain Land Company and a Partner at Defendant CrossHarbor. Defendant Kidd is responsible for development in the Yellowstone Club and Spanish Peaks Mountain Club. Defendant Kidd signed agreements on behalf of Defendant Spanish Peaks and Defendant Yellowstone Club with the Big Sky Water & Sewer District to dispose of up to 160 million gallons of treated effluent/year.

14.     Defendant Rich Chandler has acted as the Director of Environmental Operations

3

for Lone Mountain Land Company, has worked for Defendant Yellowstone Club, and has communicated with Montana DEQ about Defendant Yellowstone Club and Defendant Spanish Peaks' operations.

15.    Defendant Mike DuCuennnois is the Director of Development for Defendant Lone Mountain Land Company and served as a Director of the Sewer District during previous Clean Water Act litigation against the Sewer District. On April 19, 2022, Defendant DuCuennois participated in a public meeting held by the Big Sky Water and Sewer District during which time he voted in favor of a motion "to close the remainder of the meeting to discuss litigation strategy in the CWL vs. Big Sky County Water & Sewer District finding that having open discussion could be detrimental to the District's litigation position. Unanimous Approval." A few days later, Defendant Ron Edwards of the Sewer District proffered falsified data to a federal jury to avoid Clean Water Act liability.

16.    Defendant Ron Edwards is the former manager of Big Sky Water and Sewer District No. 363.  Defendant Edwards committed mail and/or wire fraud by sending investigators for the Montana DEQ and U.S. EPA data that had never been recorded. Defendant Edwards provided a civil jury with the same falsified data to thwart Clean Water Act liability against the Big Sky Water and Sewer District. *Cottonwood Envtl L. Ctr., et. al. v. Edwards, et. al*, 2:20-cv-00026-BMM (Doc. 236).

17.    Defendant Jon Rauchway is counsel of record in the cases of *Cottonwood Envtl L. Ctr., et. al. v. Edwards, et. al*, 2:20-cv-00026-BMM; *Cottonwood Envtl. L. Ctr., et. al. v. Yellowstone Mountain Club, LLC, et. al.*, 2:21-cv-00093-BU-BMM; *Cottonwood Envtl. L. Ctr. v. CH SP Acquisition d/b/a Spanish Peaks Mountain Club, et. al.,* 2:23-cv-00028-BMM; *Cottonwood*

4

*Envtl. L. Ctr. v. Yellowstone Mountain Club, LLC*, 2:23-cv-00026-BMM; and *Cottonwood Envtl. L. Ctr. v. Big Sky Waeter and Sewer Dist. No. 363, et. al.,* DV-22-1121A (Gallatin Cnty). Defendant Rauchway facilitated the proffering of falsified data by Defendant Edwards in the 2022 Clean Water Act jury trial. Defendant Rauchway also misrepresented documents to the federal Court relevant to a consent decree that Defendant Spanish Peaks entered into with Cottonwood to thwart additional Clean Water Act liability associated with the resort's unlawful disposal of treated effluent produced by the Big Sky Sewer District.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over the RICO claim pursuant to 18 U.S.C. § 1964.

19.    Venue in the United States District Court for the District of Montana is proper under 33 U.S.C. § 1365 (c) because Defendants' violations occurred within this district.

## FACTUAL BACKGROUND

20.    In 1993, the Montana Department of Health and Environmental Sciences, predecessor to Montana DEQ, placed a moratorium on new sewer connections in Big Sky because the treated sewage holding ponds at the Sewer District were leaking millions of gallons into the West Fork of the Gallatin River and because the treated effluent did not meet water quality standards for irrigation on the Big Sky golf course.

21.    In 2001, the Big Sky Water & Sewer District entered into an agreement with

developers under which the developers would dispose of up to 160 million gallons of treated effluent per year on land they owned. According to the agreement, the developers would build new golf courses to dispose of the treated effluent.

22.    In exchange for the developers disposing of the treated effluent, the Sewer District agreed to provide sewer connections for the collection and treatment of the developments.

23.    The Yellowstone Club  and Spanish Peaks Development, LLC, were signatories to the 2001 agreement.

24.    At the time the 2001 agreement was signed, Defendants Yellowstone Club and Spanish Peaks Clubs were owned by Tim Blixseth, who was eventually sentenced to prison for fraud associated with mismanaging the assets of the developments. The resorts were later purchased out of bankruptcy by Defendant CrossHarbor.

25.    In 2017, Defendant Matthew Kidd signed an agreement with Sewer District No. 363 on behalf of Defendants Yellowstone Club and Spanish Peaks that agreed to take over disposal obligations for the developers/signatories in the 2001 agreement.

26.    On July 10, 2020, Cottonwood filed a lawsuit against the Sewer District and Ron Edwards, in his official capacity as manager of the Big Sky Water & Sewer District, alleging the Defendants violated the Clean Water Act. *Cottonwood Envtl. L. Ctr., et. al. v. Edwards, et. al.*, 2:20-26-BMM (Doc. 1) ("*Edwards*").

27.    The Court denied Cottonwood's motion for summary judgment, in part, because of the parties' dispute regarding "the amount of pollutant entering the West Fork of the Gallatin River." *Id.* (Doc. 89 at 14).

28.    The Court determined "[t]he State of Montana regulates [] the acceptable

amount of leakage from the WRRF holding ponds. . .  The Court must establish facts sufficient to determine whether the discharges alleged by Plaintiffs more properly should be regulated by the State of Montana. The Court cannot do so without first having determined pollutant transport and quantity." Doc. 89 at 14 (citation omitted).

29.    The Court ordered the parties to answer supplemental questions regarding leakage from the holding ponds, specifically asking, "[w]hat is the minimum number of total gallons of wastewater that leaks from the WRRF holding pond each day?" Doc. 112 at 14. Without providing a water balance, Defendant Sewer District answered, "[a] de minimis amount of leakage." *Id.*

30.    During its 30(b)(6) deposition, a representative for the Montana DEQ testified that leakage can be determined by calculating the water balance—a mathematical equation that adds the volume of effluent brought into the plant plus the amount of precipitation subtracted by the volume exported and evaporation. *Id.* (Doc. 237-1).

31.    Cottonwood filed a complaint with the Montana DEQ asking it to investigate unpermitted effluent discharges from the Sewer District's holding ponds on September 17, 2021. *Id.* (Doc. 237-2).

32.    The day before the jury trial, more than six months after the original complaint was filed with the Montana DEQ, the agency sent Cottonwood a letter stating it used the data the Sewer District provided it and could not determine whether the holding ponds were experiencing "gross leakage." *Id.* at 2.

33.    In April 2022, the Court held a two-day jury trial to determine whether Defendant Big Sky Water & Sewer District violated the Clean Water Act.

34.     During the trial, Terry Campbell, a twenty-nine year engineer for the

Montana DEQ who helped investigate Cottonwood's complaint regarding leakage from the

holding ponds, testified that Montana's gross leakage standard only applies when the holding

liners are new, not when they are twenty years old. *Id.* (Doc. 237-3 at 27).

35.     Mr. Campbell also testified that if there are rips or tears in the liners, they

"certainly" should be replaced. *Id.* at 29.

36.     During the trial, Defendant Rauchway and Defendant Edwards told the jury

that the total amount of effluent that reached the West Fork in 2020 was 270,000 gallons, or

0.27 million gallons. *Id.* (Doc. 237-4 at 208).

37.     To reach this number, Rauchway and Edwards walked the jury through

detailed mathematical calculations to create a water balance. *Id.* at 201–208.

38.     In particular, Mr. Rauchway walked Mr. Edwards through a series of

questions that informed the jury that Cottonwood's expert failed to consider the volume of

treated effluent that was exported to the Yellowstone Club and Spanish Peaks during the

non-irrigation season. *Id.* at 205–206.

39.     Defendant Rauchway led Defendant Edwards through a series of well-

rehearsed calculations regarding exports to Spanish Peaks and the Yellowstone Club during

the non-irrigation season. *Id.* at 206.

40.     Defendant Rauchway had Defendant Edwards tell the jury that only 0.27

million gallons of treated effluent leaked from the holding ponds. *Id.* at 208.

41.     The other 20 million gallons that Cottonwood's expert said leaked from the

holding ponds, according to Defendant Rauchway and Defendant Edwards, was actually

exported to Spanish Peaks and the Yellowstone Club. *Id.* at 206.

42.    Defendant Rauchway closed his argument by going through each of the

*Maui* factors:

> Number 8, the total amount of pollutant that reaches the West Fork. This is perhaps the most important. These factors are not in any particular order, but how much are we talking about here? . . . You saw Mr. Edwards correct Mr. Aley's pond balance to show that this is a minimal amount of leakage. It's far less than DEQ standard. And that appears to be conceded by the plaintiffs now. We're talking about 100 times less than their expert claims, and 10 times less than DEQ's standard.

*Id.* (Doc. 237-9 at 320-321).

43.    At the end of the trial, the Court gave Instruction 14(8), which directed the

jury to determine whether the plaintiffs had proved the functional equivalent of a direct

discharge by considering, among other things, "[t]he total amount of pollutant that reaches

the West Fork." *Id.* (Doc. 141 at 16–17).

44.    The jury returned a verdict in favor of the Sewer District.  *Id.* (Doc. 143).

45.    Cottonwood moved for a new trial, which the Court denied on September 6, 2022.

*Id.* (Doc. 198).

46.    The Court decided it would "not order a new trial because the jury

performed its duty in weighing the evidence presented to it and came out against Plaintiffs.

The Court notes that Plaintiffs' expert admitted to misinterpreting the leakage data and

thereby miscalculating the results as presented in his expert reports during the trial." *Id.*

(Doc. 198 at 2).

47.    On December 12, 2022, Cottonwood filed a complaint in state court against

Defendant Edwards, the Big Sky Water & Sewer District, and the Montana DEQ regarding the leaking holding ponds and the agency's investigation. *Cottonwood Envtl. L. Ctr. v. Montana Dep't. of Envtl. Quality*, 22-cv-1121A (Gallatin Cnty.).

48.    The complaint alleged Defendant Edwards was liable for violations of civil nuisance, criminal nuisance, Montana Water Quality Act, and the Montana Constitution.

49.    The complaint alleged the DEQ violated the Montana Constitution and Montana Water Quality Act by failing to complete the investigation and determine whether the Big Sky holding ponds were experiencing gross leakage.

50.    During his deposition, Ron Edwards admitted that the export data he presented to the federal jury was never recorded. *Edwards* (Doc. 237-5 at 42–43).

51.    Defendant Edwards testified that meters broke and the Sewer District was not able to replace them because of supply chain issues during Covid. *Id.* at 42.

52.    Defendant Edwards testified that the export volumes and leakage calculation were based on "estimates." *Id.* at 43.

53.    Defendants Rauchway and Edwards never disclosed to the jury or the Court that the export data never existed or that the evidence was based on "estimates."

54.    Defendant Edwards testified in the state case that the Montana DEQ and U.S. EPA were provided with the same unrecorded data. *Id.* at 40.

55.    During its 30(b)(6) deposition, the Montana DEQ representative testified that the agency was unaware that Defendant Edwards provided it with data that did not exist. *Edwards* (Doc. 237-6 at 77; 102).

56.    When the U.S EPA learned that the 2020 data had not been recorded, it

accepted Cottonwood's calculations that the volume of leakage from the holding ponds in 2020 was 7.257 million gallons, not the .27 million gallons that Defendants Rauchway and Edwards estimated. *Id.* (Doc. 237-8 at 7).

57.     The EPA informed Cottonwood that it was moving in the direction of requiring the Sewer District to obtain a NPDES permit.



58.

59.     Ultimately, the EPA decided not to require the Sewer District to obtain a Clean Water Act permit and instead determined the volume of leakage from the holding ponds by averaging the estimated inflows and estimated outflows for the years 2015 through 2020 and concluding leakage was less than 0.1%. *Edwards* (Doc. 237-8 at 7).

60.     The EPA's mathematical equation assumed the Sewer District exported more than 40 million gallons of treated effluent than came into the plant in 2015 and more than 37 million gallons than came into the plant in 2016. *Id.* at 7.

61.     It is physically impossible for the Sewer District to export 40 or 37 million gallons more effluent than was brought into the plant.

62.      Ms. Andrea Bronson, another attorney with Defendant Rauchway's law firm that

also represented the Big Sky Water & Sewer District during the federal jury trial, instructed Defendants Edwards not to answer the question of how the 2020 water balance that was provided during the trial compares to the five years preceding. *Id.* (Doc. 237-5 at 44).

63.    The Montana DEQ has designated the West Fork of the Gallatin River that runs past the Sewer District as water-quality impaired for nitrogen pollution.

64.    The Sewer District does not hold a National Pollution Discharge Elimination System Permit and the water-quality impaired designation prevents it from obtaining one.

65.    Instead of risk facing a moratorium on sewer connections like in 1993, Defendants provided state investigators, federal investigators, and a federal jury with falsified data to continue development in Big Sky.

66.    On September 19, 2022, John Meyer, Executive Director of Plaintiff Cottonwood, walked below the high-water mark of the South Fork/West Fork of the Gallatin River with a contractor until they reached a stream discharging into the River from Defendant Yellowstone Club, property.

67.    The contractor took a water sample from the tributary, which started on the Yellowstone Club's golf course, and then another sample upstream of the discharge location. Meyer watched.

68.    Meyer and the contractor were stopped by an employee of the Yellowstone Club, who asked them what they were doing.

69.    The Cottonwood contractor told the Yellowstone Club employee he was taking water samples.

70.     When Meyer and the contractor arrived at the Ousel Falls trailhead, they were stopped by a Gallatin County Sheriff, who took a copy of their fishing licenses and identifications. Meyer and the contractor informed the Sheriff they never went above the high-water mark. The Officer did not tell Meyer and the contractor he was filming them.

71.     Nearly six months later, the Madison County District Attorney served John Meyer and the contractor with criminal trespass charges.

72.     A former president of the Montana Bar represented the Cottonwood contractor. Ultimately, the contractor agreed to a deferred prosecution for fear of a criminal record when applying for law school.

73.     Cottonwood retained a criminal defense firm to represent Meyer, who then moved to dismiss the criminal trespass charge.

74.     On July 24, 2023, the Madison County Justice Court dismissed with prejudice the criminal trespass charge against Meyer.



75.

76.     The lab results from the water samples that were collected by the Cottonwood

contractor show the tributary coming off of Yellowstone Club property contained nitrogen

pollution at twenty-six times the concentration of the surface water.

77.     The Montana Department of Environmental Quality ("DEQ") has determined the

South Fork/West Fork of the Gallatin River where the discharge occurred is water-quality

impaired for nitrogen.

78.     The Yellowstone Club does not have, and cannot secure, a Clean Water Act permit to

discharge nitrogen pollution into the South Fork/West Fork of the Gallatin River because of

its water-quality impaired designation.

14

79.     A University of Maryland Professor that earned her Ph.D in Organismal and Evolutionary Biology from Harvard University completed isotopic analysis of the algae in the South Fork/West Fork in conjunction with the University of California Davis and determined that it more likely than not contains treated effluent from the Yellowstone Club.

80.     Defendant Yellowstone Club maintains a golf course on its property that contains water hazards.

81.     Defendant Yellowstone Club has admitted it has the ability to fill its Hole 4 water hazard with treated effluent.

82.     The standing pipe shown below is found within the Hole 4 water hazard.



YC_012538

83.

84.     Schematics provided by the Yellowstone Club show the outlet pipe from the Hole 4 water hazard creates "Unnamed Tributary #4," which discharges into the South Fork/West Fork.



85.     The photo shown below is the Hole #4 water hazard draining a large volume of treated effluent into Unnamed Tributary # 4, and ultimately into the South Fork/West Fork of the Gallatin River.



86.

87.    University of Maryland Professor Pat Glibert completed isotopic analysis of the algae in the Hole 4 water hazard in conjunction with the University of California Davis and determined it is more likely than not that it contains treated effluent.

88.    Schematics provided by the Yellowstone Club show the water hazards on the northwest corner of the golf course create "Unnamed Tributary #2," which drains into the South Fork/West Fork of the Gallatin River.



89.

90.     Dr. Gilbert completed isotopic analysis of the microalgae in those water hazards and

determined it is more likely than not that they too contain treated effluent.

91.     Dr. Gilbert used isotopic analysis to determine it is more likely than not that the algae

in the South Fork/West Fork of the Gallatin River below the Yellowstone Club's golf course

contains treated effluent from the Yellowstone Club.

92.     The Montana Department of Environmental Quality requires the Yellowstone

Club to sample the treated effluent it uses to irrigate its golf course to ensure it is adequately

disinfected.

93.     The Montana DEQ does not require any setback between the sprinklers and

the water hazards or tributaries because the treated effluent is required to be adequately disinfected.

94.    The treated sewage used to irrigate the golf course is considered adequately disinfected if the fecal coliform is 2.2 CFU/100mL or less for any given sample.

95.    On July 19, 2023, fecal coliform levels were 1,200 CFU/100 mL in the effluent used to irrigate the golf course.

96.    On August 1, 2023 fecal coliform levels were 6,500 CFU/100mL in the effluent used to irrigate the golf course.

97.    On August 15, 2023 fecal coliform levels were 280 CFU/100mL in the effluent used to irrigate the golf course.

98.    Defendant Yellowstone Club's irrigation practices pose a human health risk.

99.    Defendants have known for years that the effluent used to irrigate the Yellowstone Club golf course is not adequately disinfected.

100.    On May 29, 2019, Defendant Chandler sent Defendant DuCuennois an email stating, "the [total coliform] is out the roof and the fecal coliform and e-coli are also not conforming to unrestricted irrigation."

101.    In addition to measuring fecal coliform concentrations in the effluent before it is used to irrigate the golf course, the Yellowstone Club is also required to monitor two springs on the golf course and two outfalls at the edge of the golf course that discharge into the South Fork/West Fork of the Gallatin River.

102.    The outfalls have repeatedly exceeded fecal coliform concentrations of 2.2 CFU/100mL.

19

103.    The Montana DEQ Escherichia coli (E. coli) Assessment Method for State

Surface Waters Final, 2020 WQDWQPBWQA-01, Version 1.0 allows a user to convert

between E. Coli and fecal coliform:

### 6.2 SUPPLEMENTAL INFORMATION

*E. coli* bacteria density data is the only data type required for assessment (**Section 3.6**), though additional data types may be useful to consider during risk assessment, monitoring design or source assessment:

**Fecal coliform data**
Fecal coliform data is not used for assessment using *E. coli* standards. If fecal coliform data exists and it is used to screen for risk of pathogen contamination, fecal coliform densities (cfu/100ml) may be converted to *E. coli* densities using the ratio of 200 fecal coliform to 126 *E. coli* (0.63).

**Flow**
Discharge data collected concurrently with E. coli samples can be used to calculate loads:
Load = Concentration x Flow x Unit conversion factor

**Land Use Information**
Land use information related to pathogens (e.g., septic density, domestic pet parks, recreational stock (e.g., hobby horses) access, grazing allotments, wildlife use, land application, animal feeding operations, stormwater outfalls and wastewater treatment plants) supports monitoring designs and source assessment. Information about public access and recreation sites such as public beaches, fishing access points, campgrounds, parks, etc., may also inform monitoring location selection.

**Reconnaissance, Photos, and Visual Observations**
Visual observations and photos can help to substantiate assessment decisions and source assessments, such as observations of septic leakage, dumping, or fecal excrement in or near a waterbody.

| Final | 22 |
|---|---|

104.    Water samples taken from the Yellowstone Golf Course's monitoring outfalls

show e-coli and fecal coliform concentrations consistently and sometimes radically exceeded

disinfection standards.

105.    On July 23, 2024, Defendant Yellowstone Club took a water sample from one

of the outfalls with an e-coli concentration of 540 CFU/100mL.

106.    On August 4, 2024, Defendant Yellowstone Club took a water sample from a

stream with an e-coli concentration of 520 CFU/100mL.

107.    The Montana DEQ has largely ignored requests to investigate e-coli and fecal coliform concentrations in the wastewater and streams leaving the golf course.

108.    Defendant Yellowstone Club sprays treated effluent in an area known as Crushmore below its Sewage holding pond.

109.    The Crushmore area, circled in the photo below, is 36 acres in size and is located above Second Yellow Mule Creek, which flows into the South Fork/West Fork of the Gallatin River. *Cottonwood*, 2:23-cv-00026-BMM (Doc. 35-1).

110.    Defendant Yellowstone Club determined the volume of treated sewage that can be sprayed on the Crushmore area by characterizing the area as forested.

111.    The Crushmore area is an old clearcut.



112.

113.    One of Cottonwood's experts determined Crushmore has been consistently over-irrigated with millions of gallons of effluent.

114.    Second Yellow Mule Creek forms a headwater of the South Fork/West Fork of the Gallatin River and has been designated as water-quality impaired for nitrogen pollution by the Montana DEQ.

115.    Isotopic analysis has been used to determine it is more likely than not that the algae in Second Yellow Mule Creek contains nitrogen from the Yellowstone Club's treated effluent.

116.    Defendant Kidd signed an agreement with the B Sewer District that contractually obligated Defendant Spanish Peaks to dispose of effluent produced by the Sewer District.

117.    On November 16, 2022, Plaintiff Cottonwood and Defendant Spanish Peaks entered into a consent decree stemming from a lawsuit alleging Spanish Peaks violated the Clean Water Act by over-irrigating its golf course and allowing treated effluent to leak through tears in the liner of one of its treated sewage holding ponds. *Cottonwood*, 2:21-cv-00093-BU-BMM (Doc. 68).

118.    The consent decree required Defendant Spanish Peaks to provide Plaintiff Cottonwood with a copy of the Nutrient Management Plan that regulated irrigation of the golf course within fourteen days. *Id.* at 4, ¶8.

119.    After the consent decree was filed with the district court for approval, but before the district court signed it, Defendant Spanish Peaks began blowing treated sewage out of snow guns onto ski slopes.

120.    Defendant Spanish Peaks sprays so much treated sewage onto its ski slopes during the summer that effluent has been documented running down a street.



121.    The Cottonwood contractor that witnessed the spraying and took the photo
above and filed declarations stating his belief that the treated sewage was discharging into a
tributary of the Gallatin River. *Cottonwood Envtl. L. Ctr. v. CH SP Acquisition LLC d/b/a
Spanish Peaks Mountain Club*, 2:23-cv-00028-BMM (Doc. 80-1 at 2, ¶¶4-5). The contractor
could not see that actual discharge because the ravine over which the effluent was flowing
was too steep. *Id.*

122.    Isotopic analysis of the algae in the tributary below the spraying determined it
contains treated effluent. *Id.* (Doc. 59-3; 59-4; 66-3).

123.    Cottonwood filed a second lawsuit alleging Defendant Spanish Peaks violated the
Clean Water Act by over-irrigating the ski slopes. *Cottonwood Envtl. L. Ctr. v. CH SP
Acquisition LLC d/b/a Spanish Peaks Mountain Club*, 2:23-cv-00028-BMM.

23

124.    Defendant Rauchway moved for summary judgment on behalf of Defendant Spanish Peaks by stating there was only one golf course and the consent decree precluded Cottonwood from bringing a second challenge. *Id.* (Doc. 40 at 2, ¶1; Doc. 41 at 3).

125.    Plaintiff later learned that Defendant Spanish Peaks has two golf courses and the spraying on the ski slopes is regulated under an entirely different Nutrient Management Plan.

126.    Spanish Peaks cannot obtain a National Pollution Discharge Elimination System permit for its spray irrigation which discharges nitrogen pollution into the West Fork of the Gallatin River because the river is listed as water-quality impaired by the Montana DEQ.

127.    Instead of risking an injunction on development in Spanish Peaks, Defendant Rauchway knowingly misrepresented material facts to thwart Clean Water Act liability for his co-conspirators.

128.    The Gallatin River and its tributaries have suffered from severe algae blooms for the last several years as a result of Defendants' coordinated efforts to continue unlawfully disposing of treated effluent.

## LEGAL BACKGROUND

129.    The RICO Act was passed by Congress with the declared purpose of seeking to eradicate organized crime in the United States.

130.    Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

24

131.    "To state a claim under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc).

132.    "[T]o conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, § 1962(c), one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

133.    "RICO liability is not limited to those with primary responsibility for the enterprise's affairs." *Reves,* 507 U.S. at 179.

134.    RICO does not "require[e] significant control over or within an enterprise." *Reves,* 507 U.S. at 179 n.4.

135.    Instead, a plaintiff need only show the defendant has "some part in directing the enterprise's affairs[.]" *Reves,* 507 U.S. at 179.

136.    "Racketeering activity" consists of no more than the commission of a predicate act. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985).

137.    A "pattern of racketeering activity" "requires at least two acts of racketeering activity" that occur within ten years of one another. 18 U.S.C. § 1961(5).

138.    Racketeering activity includes the predicate acts of mail fraud and wire fraud. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (citation omitted).

139.    "RICO is to be read broadly ... [and] liberally construed to effectuate its remedial purposes." *Sedima*, 473 U.S. at 487-98; *Reves*, 507 U.S. at 183.

140.    "Enterprise" is defined as "any individual, partnership, corporation, association, or

other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

141.    To show the existence of such an enterprise "plaintiffs must plead that the enterprise has (A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir 2014) (citation omitted).

## CLAIM FOR RELIEF

### I.    Defendants violated the Racketeer Influenced and Corrupt Organizations Act.

142.    Plaintiff realleges and incorporates by reference all preceding paragraphs.

143.    Defendants have violated RICO by participating in conduct of an enterprise that affected interstate commerce through a pattern of racketeering activity.

144.    Defendants created an enterprise that affected interstate commerce by conspiring and/or thwarting investigations into unlawful disposal of treated sewage in Big Sky.

145.    Defendants created an enterprise that affected interstate commerce by conspiring to, and unlawfully disposing of, treated effluent in Big Sky, Montana.

146.    Defendants engaged in a pattern of racketeering activity when it committed mail/wire fraud by sending DEQ and U.S. EPA falsified data.

147.    Section 75-5-633, MCA makes it unlawful for a person to falsify monitoring data.

148.    Defendants Edwards sent falsified monitoring data to DEQ and EPA investigators.

149.    Section 45-7-201(1), MCA, makes it a crime for a person to "knowingly make[] a false statement under oath."

150.    Defendants Edwards and Rauchway knowingly made false statements under oath

regarding the volume of effluent that was recorded as exported to Spanish Peaks and Yellowstone Club for disposal.

151.    Section 45-7-208, MCA, makes it a crime for a person to knowingly make a false entry in or false alteration of any record or to make, use, or present any record knowing it to be false with the purpose that it be taken as a genuine part of information.

152.    Defendant Edwards knowingly presented false alterations of export data that he sent to state and federal investigators with the purpose that they be taken as genuine.

153.    Defendants Edwards and Rauchway knowingly presented false alterations of export data to a federal jury that they knew to be false with the purpose that it be taken as genuine.

154.    Section 45-7-203, MCA, makes it a crime for a person to mislead a public servant that is performing an official function by submitting any writing that the person knows to be forged, altered, or otherwise lacking in authenticity.

155.    Defendant Edwards committed mail/wire fraud by sending export data to public servants (investigators) on at least two occasions that he knew to be forged, altered, or lacking in authenticity.

156.    Defendants Yellowstone Club, Spanish Peaks, Lone Mountain Land Company, Chandler, and DuCuennois participated in the conduct of the enterprise by knowingly disposing of treated effluent in unlawful ways.

157.    Defendants CrossHarbor and Kidd own, manage, or otherwise direct the actions of many of the Defendants participating in the conduct of the illegal enterprise.

158.    As a principal of Defendant CrossHarbor, President of Defendant Lone Mountain

Land Company, and signatory to the 2017 agreement with the Sewer District, Defendant

Matt Kidd participated in the conduct of the enterprise by requiring Defendant Yellowstone

Club, Defendant Spanish Peaks, Defendant Lone Mountain Land Company, and Defendant

Rich Chandler to knowingly dispose of treated effluent in the unlawful ways described in this

complaint to continue development.

159.    Defendant DuCuennois, Director of Development for Defendant Lone Mountain

Land Company and a director of the Sewer District,  participated in the conduct of the

enterprise by joining in closed door meetings of the Sewer District in which litigation

strategy was discussed immediately before Defendants Edwards and Rauchway presented

falsified evidence to a federal jury. Defendant DuCuennois worked with Defendant

Chandler to unlawfully dispose of the effluent they knew was not adequately disinfected.

160.    Defendant Edwards participated in the conduct of the enterprise by committing the

predicate act of mail and/or wire fraud when he mailed or wired falsified data to Montana

DEQ and U.S. EPA Investigators. Defendant Edwards presented falsified data to a federal

jury to enable the Sewer District to thwart liability for the leaking holding ponds.

161.    Defendant Rauchway participated in the conduct of the enterprise by

knowingly displaying falsified data to a federal jury during a Clean Water Act trial in 2022

and suborning Defendant Edwards to misrepresent falsified data. Defendant Rauchway

intentionally misrepresented that Defendant Spanish Peaks only has one golf course and

Nutrient Management Plan to thwart its liability for unlawfully disposing of treated

wastewater.

162.    Defendants' enterprise has a common purpose of unlawfully disposing of

wastewater to continue unnecessary luxury development in Big Sky, Montana.

163.    Defendants' enterprise of unlawfully disposing of treated effluent was structured and organized to connect new sewer connections to the Big Sky Water and Sewer District to continue making profits.  Defendant Edwards committed wire and/or mail fraud by presenting falsified data to thwart government investigations and continue allowing sewer connections to the Sewer District. Defendant Rauchway knowingly suborned and presented the falsified data to a federal jury. Defendant Rauchway intentionally misrepresented to the Court material facts regarding the number of golf courses and management plans that control disposal of effluent in Spanish Peaks. Defendant DuCuennois, as a Director of the Sewer District, had a closed-door meeting with Defendant Edwards immediately before he presented falsified data to the federal jury.  Defendant DuCuennois worked with Defendant Chandler to knowingly dispose of treated effluent that they knew was not adequately disinfected to ensure Defendant Lone Mountain Land Company, which he was Director of Development, could continue to connect sewers to the Sewer District. Defendant Chandler facilitated the unlawful disposal of undisinfected effluent into waters of the United States.

164.    Defendant DuCuennois works with and reports to Defendant Kidd, who signed the 2017 agreement with the  Sewer District to dispose of treated effluent in Spanish Peaks and the Yellowstone Club in exchange for continued sewer connections. Defendant Kidd is a Partner of Defendant CrossHarbor, which owns Yellowstone Club, which unlawfully disposes of treated effluent by filling the Hole 4 water hazard and other water hazards on the golf course with treated effluent and letting it drain from a pipe into the South Fork/West Fork of the Gallatin River.

165.    Defendants' enterprise has had longevity—several years—to accomplish the purpose of knowingly and unlawfully disposing of wastewater to continue construction of luxury development.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.  Declare, hold, and adjudge that Defendants have violated and continue to violate RICO, 18 U.S.C. § 1964.

B.  Declare that Plaintiffs suffered economic damages as a result of their RICO violation.

C.  Order Defendants to compensate Plaintiffs treble damages that they incurred as a result of the RICO violation.

D.  Award Plaintiffs their reasonable litigation costs and expenses, including attorney and expert fees, incurred in bringing this action.

E.  Award such other relief as the Court may deem just and proper.

DATED this 21st day of March, 2025.

Respectfully Submitted,

/s/ John Meyer
JOHN MEYER
P.O. Box 412
Bozeman, MT 59771
(406) 546-0149
john@cottonwoodlaw.org

*Counsel for Plaintiffs*

30