# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BUTTE DIVISION

|  |  |
|---|---|
| MONROE CAMERON, at al., individually and on behalf of all others similarly situated, | No. 2:25-CV-33-BMM |
| Plaintiff, | |
| v. | ORDER |
| CROSS HARBOR CAPITAL PARTNERS, LLC; CH SP ACQUISITION LLC, d/b/a SPANISH PEAKS MOUNTAIN CLUB; YELLOWSTONE MOUNTAIN CLUB, LLC; LONE MOUNTAIN LAND COMPANY; MATT KIDD; MIKE DUCUENNOIS; RICH CHANDLER; RON EDWARDS, | |
| Defendants. | |

## INTRODUCTION

Cottonwood Environmental Law Center ("Cottonwood") filed a complaint on March 21, 2025, against Defendant Ron Edwards ("Edwards"), Defendant Jon Rauchway ("Rauchway"), and Defendants CrossHarbor Capital Partners LLC, CH SP Acquisition, LLC d/b/a Spanish Peaks Mountain Club, Yellowstone Mountain

Club LLC, Lone Mountain Land Company, Matt Kidd, Mike DuCuennois, and Rich Chandler (collectively "YC Defendants"), alleging a violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act. (Doc. 1 at 2.) Cottonwood amended its complaint on July 16, 2025, to substitute Plaintiff Monroe Cameron ("Cameron") for Cottonwood as the plaintiff and dismiss Defendant Rauchway. (Doc. 29.) Cameron alleges Defendants engaged in wire/mail fraud by sending fraudulent data to state and federal investigators regarding the volume of effluent that the Big Sky Water & Sewer District ("BSWSD") exported to Defendant Yellowstone Club and Defendant Spanish Peaks for disposal. (*Id*. at 2.) Cameron alleges this fraud formed the predicate RICO violation by contributing to the creation of "an enterprise with the common purpose of developing unnecessary luxury houses in Big Sky, Montana." (*Id*.) Edwards filed a motion to dismiss Cameron's RICO claim against him on August 7, 2025. (Doc. 31.) YC Defendants filed a motion to dismiss the claim against them on August 7, 2025 (Doc. 33.) The Court held a hearing on September 25, 2025. (Doc. 47.)

## FACTUAL BACKGROUND

The motions before the Court stem from a lengthy history of litigation between the parties. (*See Cottonwood v. Big Sky Water and Sewer District, et al,* CV-20-28-BU-BMM.) Cottonwood initiated a Clean Water Act lawsuit in July 2020 that

culminated in a jury trial in April 2022. (*Id*.) The jury returned a verdict in favor of BSWSD. (*Id*. at Doc. 142.) Cottonwood moved for a new trial, claiming, among other things, that BSWSD had presented false evidence at trial. (*Id*. at Doc. 173.) The Court denied Cottonwood's motion. (*Id*. at Doc. 198.) Cottonwood appealed issues related to the Court's summary judgment orders and jury instructions. (*Id*. at Doc. 210.) The Ninth Circuit affirmed. *See Cottonwood Evn't L. Ctr. v. Edwards*, 86 F.4th 1255, 1264 (9th Cir. 2023). Cottonwood petitioned for rehearing en banc, and that petition was denied. *Cottonwood Evn't L. Ctr. v. Edwards*, No. 22-36015, 2024 U.S. App. LEXIS 674 (9th Cir. Jan. 10, 2024).

Cottonwood sought relief tangential to the above litigation in other venues. Cottonwood sued BSWSD and its former general manager, Ron Edwards, and the Montana Department of Environmental Quality ("DEQ") in Montana state district court. (*See Cottonwood v. Big Sky Water and Sewer District, et al,* CV-20-28-BU-BMM at Doc. 238-1.) The Montana state district court dismissed claims against BSWSD and Edwards and granted summary judgment to DEQ. (*See Id.* at Doc. 238-2; Doc. 238-3.) Cottonwood also filed administrative complaints with DEQ, and the United States Environmental Protection Agency ("EPA") related to the above litigation. DEQ declined to pursue Cottonwood's claims as "evidence did not support the allegation the Ponds were leaking in excess of the design standard; or that the Golf Course is being over irrigated." (*Id*. at Doc. 238-4.) The EPA also declined to

3

pursue Cottonwood's claims stating that there were "no ongoing investigations regarding this matter" and "the information cited in the portion of the email exchange excerpted in the court's order has not resulted in the EPA changing the conclusions and recommendations in its February 8, 2024 NPDES Inspection Report." (*Id*. at Doc. 238-5 at 7.)

Cottonwood sought further relief from this Court under Federal Rule of Civil Procedure 60(b). (*See Cottonwood v. Big Sky Water and Sewer District, et al,* CV-20-28-BU-BMM at Doc. 238 Ex. 1.) Cottonwood alleged that BSWSD committed fraud on the court. (*Id*. at Doc. 236.) The Court held that Edwards and BSWSD "did not falsify data" and that Cottonwood's fraud-based hypothesis had been "disproven." (*Id*. at Doc. 266.) The Court sanctioned Cottonwood $7,500 in attorneys' fees to BSWSD for its "baseless fraud theory," "reckless misstatements," and "disregard of facts." (*Id*.) The Court noted in that order that Cottonwood was advancing the same baseless allegations under the same fraud theory in the civil RICO action at issue here. (*Id*.)

## LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires claimants to include in their complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint under the plausibility

pleading standard of Rule 8(a)(2). *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal proves appropriate under Rule 12(b)(6) where the complaint fails to state a claim upon which relief can be granted. *Mendiondo v. Centinela Hospital Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). A court may dismiss a complaint "based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

A complaint must contain sufficient factual matter to state a plausible claim for relief on its face to survive a Rule 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim proves plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard does not require probability, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court must "take[] as true and construe[] in the light most favorable to plaintiffs" all factual allegations set forth in the complaint. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (internal quotation marks omitted). "Conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000) (citing *Halkin v. Verifone Inc.* 11 F.3d 865, 868 (9th Cir.

1993)). "[A] RICO claim predicated on mail or wire fraud is subject to Rule 9(b)'s heightened pleading standard." *Rosen v. Duel*, No. 221CV08935FWSRAO, 2023 WL 7475733, at *3 (C.D. Cal. Mar. 21, 2023).

## DISCUSSION

To succeed on a RICO claim under section 1962(c), a plaintiff must show the defendant participated in "(1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity or collection of unlawful debt." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c)).

The statute defines "[e]nterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). To show the existence of such an enterprise "plaintiffs must plead that the enterprise has (A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Properties East*, 751 F.3d at 997 (citation omitted). "Racketeering activity" consists of the commission of a predicate act. *Sedima*, 473 U.S. at 495.

A "pattern of racketeering activity" "requires at least two acts of racketeering activity" that occur within ten years of one another. 18 U.S.C. § 1961(5). Mail fraud and wire fraud may constitute predicate acts to prove the existence of racketeering activity. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (citation

omitted). "The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Properties East*, 751 F.3d at 997. "In order to prove a violation of 18 U.S.C. § 1341, there must be a showing of a specific intent to defraud. The intent to defraud may be inferred from a defendant's statements and conduct." *United States v. Peters,* 962 F.2d 1410, 1414 (9th Cir.1992).

The factual allegations in the pleadings plausibly must support each element of a RICO claim. *Eclectic Properties East*, 751 F.3d at 995-997. A claim is subject to dismissal absent factual allegations plausibly supporting each element of the RICO claim. *Id.* at 1000. Defendants assert that Cameron's Complaint should be dismissed because he lacks standing, fails to plausibly allege each substantive element of a RICO claim, and the preclusion doctrines bar his claim. (Docs. 32 and 34.) The Court will address each argument in turn. The Court will address the motions to dismiss by each Defendant jointly and will address each Defendant's distinct arguments only when necessary.

## I.    Standing

Under the civil RICO statute, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue." 18 U.S.C. §

1964(c). "RICO standing under § 1964(c) requires a plaintiff to show '(1) that his alleged harm qualifies as an injury to business or property; and (2) that his harm was 'by reason of' the RICO violation." *Marshall v. Goguen,* 604 F. Supp. 3d 980, 993 (D. Mont. 2022) (citing *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019)). Section 1964(c) requires concrete injury "by reason of" the alleged violation, which requires causation in two forms. "[T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi Group, LLC v. City of New York, N.Y.,* 559 U.S. 1, 9 (2010).

"[S]peculative 'but for' causation is insufficient to state a RICO violation." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 774 (9th Cir. 2002). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). The Ninth Circuit has provided further instruction on this analysis:

> "To answer this question, we are guided by three practical considerations: (1) 'the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the [RICO] violation, as distinct from other, independent, factors'; (2) 'directly injured victims can generally be counted on to vindicate the law,' rendering unnecessary recognition of a cause of action for those only indirectly injured; and (3) allowing recovery by indirectly injured

plaintiffs 'would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury ... to obviate the risk of multiple recoveries.'"

*Club One Casino, Inc. v. Perry*, 837 Fed. Appx. 459, 460–61 (9th Cir. 2020) (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 269–70 (1992)). Courts are clear that this standard requires a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268. "A link that is 'too remote,' 'purely contingent,' or 'indirect' is insufficient." *Hemi*, 559 U.S. at 9.

Cameron alleges that the amended complaint satisfies this proximate causation standard. (Doc. 39 at 22.) Cameron cites the pleading in the complaint stating "Class Representative Monroe Cameron is a resident of Big Sky, Montana[,] [h]is home is connected to the Sewer District and he has paid utility bills to cover costs associated with Defendants' unlawful racketeering." (*Id*. citing Doc. 29 ¶7.) Cameron alleges that he and all Big Sky residents "paid utility bills to cover the costs associated with Defendants committing the predicate acts of wire/mail fraud by sending the fraudulent data to DEQ investigators on November 30, 2021 and EPA investigators in 2023." (*Id*. at 23.) Cameron states the simple proximate causation standard is clearly met because "Plaintiffs' claimed damages are nothing more and nothing less than the discrete costs associated with Defendants' committing the predicate acts of wire/mail fraud." (*Id*.) Cameron does not include any allegations

concerning when his utility bills increased, by how much, or how they were tied in any way to the alleged racketeering acts.

Cameron does not address Defendants' arguments that a multitude of other causes could have contributed to increased utility bills that bear no relation to the alleged racketeering activity. Defendants assert that when the alleged injury could have been caused by any sort of unrelated reason, it effectively breaks the chain of causation necessary under the proximate causation standard. (Doc. 32 at 28-32, Doc. 34 at 16-17.) Defendants cite case law supporting their position that proximate cause is lacking when "it would be too difficult to ascertain what damages are attributable to [d]efendants alleged RICO violation, as opposed to factors other than, and independent of, [d]efendants" conduct. *Marshall*, 604 F. Supp. 3d at 1007 (quoting *Painters & Allied Trade*, 943 F.3d at 1251). The high bar for standing in civil RICO claims, and particularly the strict requirement to prove proximate causation, undermines Cameron's assertion that proximate causation has been met in this case.

Defendants claim that "[i]ncreases could be 'for any number of reasons unconnected to the asserted pattern of fraud.'" (Doc. 32 at 22, Doc. 43 at 17 quoting *Anza*, 547 U.S. at 458.) And further, "[i]ncreased bills or membership dues could be from inflation of a variety of other external factors." (Doc. 32 at 22 citing *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 984 (9th Cir. 2008).) The Court agrees with Defendants. The Court does not see how Cameron has plausibly proven that the

alleged increase in his utility bills causally connects, proximately or directly, to Defendants' act of sending allegedly fraudulent data to EPA and DEQ. The chain of causation between utility rates and the allegedly fraudulent data appears tenuous at best.

Even viewing as true the factual allegations in the amended complaint, the standard for proximate causation has not been plausibly alleged in this case. Cameron alleges that his utility rates increased because the BSWSD had to expend resources and time into responding to investigations by EPA and DEQ concerning allegations of fraudulent data. Assuming that the data Defendants sent to EPA and DEQ was fraudulent—of which there is no proof other than a far-fetched argument that because EPA did not use the data, it must have been fraudulent—the investigation was not triggered by the sending of that data but rather by Cottonwood's own actions. BSWSD had to respond to the investigations not because they proactively sent allegedly fraudulent data to EPA and DEQ but rather because Cottonwood initiated the investigations.

The Court does not want to set a precedent that advocacy organizations like Cottonwood should be punished for whistleblowing so it will ignore this causation problem and instead focus on the next step in Cottonwood's reasoning. Assuming Defendants' act of sending allegedly fraudulent data to EPA and DEQ prompted the agencies to investigate BSWSD, simply no evidence exists that those investigations

caused utility rates to increase. Increases in utility rates could be "for any number of reasons unconnected to the asserted pattern of fraud." *Anza*, 547 U.S. at 458.

Fact patterns that included less tenuous chains of causation have been dismissed in the past. The Ninth Circuit in *Canyon County* affirmed the district court's dismissal of a plaintiff's complaint based on a failure to establish proximate cause. 519 F.3d at 980. The plaintiff in *Canyon County* alleged that it "ha[d] paid millions of dollars for health care services and criminal justice services for the illegal immigrants who ha[d] been employed by the defendants in violation of federal law." *Id*. The Ninth Circuit concluded that the proximate causation argument was too tenuous and went through the hypothetical analysis:

> As to the first consideration, the difficulty of assessing causation, the asserted causal chain in this instance is quite attenuated, and there are numerous other factors that could lead to higher expenditures by the County.[] In fact, it is not clear how the companies' hiring of undocumented immigrants would increase demand for health care and law enforcement within Canyon County. [] The causal chain would also be difficult to ascertain because *there are numerous alternative causes that might be the actual source or sources* of the County's alleged harm. Increased demand for public health care and law enforcement may result from such varied factors as: demographic changes; alterations in criminal laws or policy; changes in public health practices; shifts in economic variables such as wages, insurance coverage, and unemployment; and improved community education and outreach by government.

*Canyon Cnty.*, 519 F.3d at 982–83 (emphasis added).

Similar to the court in *Canyon County*, the Court would have to evaluate the extent to which the resources demand on BSWSD triggered by the investigations

from EPA and DEQ had caused increased utility rates. This assessment, like that in *Canyon County*, would consist of constructing an alternative scenario of what would have occurred had the investigations not happened, and determining how BSWSD resources would have instead been spent, what these alternative work demands would have cost BSWSD, and how those costs would or would not have been passed down to the residents of Big Sky. The Ninth Circuit recognized that "[t]his would be an 'intricate, uncertain' inquiry of the type that the *Anza* Court warned against." *Id.* at 983. Cameron's allegations prove speculative at best. Cameron's amended complaint fails for lack of proximate causation.

## II.    Substantive Civil RICO Claim

To succeed on a RICO claim under section 1962(c), a plaintiff must show the defendant participated in "(1) the conduct of (2) an enterprise that affects interstate commerce (3) through a pattern (4) of racketeering activity or collection of unlawful debt." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (citing 18 U.S.C. § 1962(c)). "Racketeering activity" consists of the commission of a predicate act. *Sedima*, 473 U.S. at 495. A "pattern of racketeering activity" "requires at least two acts of racketeering activity" that occur within ten years of one another. 18 U.S.C. § 1961(5). Mail fraud and wire fraud may constitute predicate acts to prove the existence of racketeering activity. *Sanford v.*

*MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) The Court will address separately the motions to dismiss from Defendant Edwards and YC Defendants.

a. <u>Defendant Edwards</u>

Cameron alleges that the predicate acts of mail/wire fraud entailed Edwards sending fraudulent data to DEQ and EPA investigators after the Clean Water Act jury trial in 2022. (Doc. 39 at 12-18.) Cameron states "[b]ecause the EPA did not use the 2020 data that Edwards provided him, Plaintiff Cameron has alleged a plausible predicate act of mail/wire fraud." (*Id*. at 20.) The EPA allegedly used the numbers sent to it by Cottonwood in its investigation, although the parties dispute this assertion. (Doc. 39 at 14.) Cameron further asserts that "[t]he allegation is supported by the fact that the 2020 data the EPA did not accept are the November and December 2020 exports located in the 'hidden' spreadsheet that formed the basis of the motion for a new trial." (*Id*. at 20.)

Edwards asserts that the public record forecloses the allegations that he submitted false data. (Doc. 32 at 21.) Edwards cites the fraud on the court motion and order from this Court and the Montana state court litigation as evidence in the public record. (*Id*.) Edwards argues that the Court in the fraud on the court order found that Edwards "at no point provided false data" at trial, "which necessarily means he did not provide false data to DEQ and EPA." (*Id*.) Edwards further cites

the EPA and DEQ investigation reports which show that the "agencies have investigated the subject matter and rejected the [complaint's] allegations." (*Id*.)

Cameron counters that the Court did not address the exact issue in the fraud on the court claim because the order "never addressed the undisputed fact that the EPA investigation did not rely on the 2020 data that Edwards sent it." (Doc. 39 at 18.) Cameron reiterates allegations from the pleadings like the fact that, "Edwards sent the same data to DEQ investigators, who spent six months reviewing the data until they sent a letter the day before the jury trial stating the agency could not determine whether the ponds were experiencing 'gross leakage' using the data Defendant Edwards sent." (*Id*.) Cameron appears to claim that the Montana state court litigation did not address the same issue partially because it originally "denied Montana DEQ's motion to dismiss and did not grant DEQ summary judgment until the agency mooted out the claim by completing a new investigation." (*Id*.) Cameron also condemns Edwards for not mentioning the statement from the Montana state court directing Cottonwood to raise the issue of whether BSWSD presented 'false evidence' at the federal trial in the Federal District Court. (*Id*.) To the extent the Court did not address these allegations before, it does so explicitly now.

Cameron's RICO allegation depends upon a finding that the data shared by Defendants was fraudulent. If the data is not fraudulent, no predicate act of wire/mail fraud exists because the wrongfulness of the act must be based on the fraudulence

of the data. The Court already assessed in depth the allegations of fraudulent data. The Court held in its order in July of 2025 on Cottonwood's motion to vacate, that the "BSWSD did not falsify data." (*Cottonwood v. Big Sky Water and Sewer District, et al,* CV-20-28-BU-BMM at Doc. 266 at 5.) The Court scrutinizes each of Cottonwood's assertions and concludes no evidence exists that anyone "falsified the data contained in the spreadsheets." (*Id*. at Doc. 266 at 18.) Cameron's allegations in this complaint involve the same data and the same spreadsheets as the Court discussed in Cottonwood's fraud on the court claim. (*Id*. at Doc. 266; *see also* Doc. 39 at 15, 20 [admitting this case concerns the same data and spreadsheets].)

Cameron also admitted at the hearing that this claim concerns the same data and the same spreadsheets as in the previous case. The only distinguishing allegation Cameron makes concerning the data is that the Court in the fraud on the court order did not address the fact that the EPA had declined to use Defendants' data for its calculations during its investigation. This allegation does not materially alter the question of whether the data was fraudulent. The Court already conclusively answered this question in the negative. (*Id*. at Doc. 266 at 5, 18, 23, 24-25.) The fact that the EPA did not use the data sent to it by Defendants in no way proves that the data was false. This assertion ignores the high pleading bar for a civil RICO claim and asks the Court to make a series of inferences unsupported by the evidence.

Cameron's amended complaint fails to plausibly allege a substantive civil RICO claim as to Defendant Edwards.

   b. <u>YC Defendants</u>

  YC Defendants allege that Cameron fails to plausibly allege that any of the YC Defendants committed RICO predicate acts. (Doc. 34 at 18.) Cameron generally asserts that "the actions YC Defendants took to ensure continued development under the 2017 agreement, including participation in wire/mail fraud and knowingly accepting treated sewage for disposal that did not meet DEQ water standards, make up the illegal scheme." (Doc. 35 at 28.) Cameron specifically argues that the following predicate acts of the YC Defendants support his claim:

- "Defendant DuCuennois was at the center of the scheme to continue unlawfully approving sewer connections at the Sewer District. Defendant DuCuennois participated in conversations with Defendant Edwards about the fraudulent 2020 data that was sent to DEQ and EPA investigators. Defendant DuCuennois was cc'd onto an email with DEQ investigators that contained the fraudulent data.[] Defendant DuCunneois meant for the fraudulent data sent by Defendant Edwards to thwart agency investigations so that the Sewer District would continue to accept new sewer connections for his employer—Defendant Lone Mountain Land Company." (Doc. 35 at 24-25.) "Defendants DuCuennois and Edwards continued to accept new sewer connections from YC Defendants despite knowing the 2020 data was fraudulent." (*Id*. at 26.)

- "On July 25, 2018, Defendant Lone Mountain Land Company participated in a call with other YC Defendants to discuss the Big Sky Water & Sewer District's data." (Doc. 35 at 25.) They allegedly acknowledged the unsustainable sewer system. (*Id*.)

- "In May 2021, YC Defendants Chandler[1] and Kidd[2] met with an employee of Defendant Lone Mountain Land and employees of Big Sky Resort to address the "immediate" need to improve "record keeping" of the Big Sky Water & Sewer District." (*Id*. at 26.) "In June 2021, Defendants Chandler and Kidd met to discuss "outflow data" from Big Sky Water & Sewer District" (*Id*.) "Defendant DuCuennois and Defendant Chandler also allowed effluent that did not meet water quality standards to be sent to Defendant Yellowstone Club and Defendant Spanish Peaks for years to unlawfully continue development under the 2017 agreement." (*Id*. at 26-27.)

- Cameron also makes a respondeat superior argument arguing that "YC Defendants CrossHarbor Capital Partners, Lone Mountain Land, Yellowstone Club, and Spanish Peaks benefitted from their employees' [Edwards presumably although he was an employee of the BSWSD] RICO violation." (Doc. 35 at 25.)

YC Defendants assert that Cameron must "allege at least two predicate acts by each defendant." (Doc. 34 at 12 quoting *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F.Supp.2d 1002, 1035 (C.D. Cal. 2011); citing *Marshall,* 604 F.Supp.3d at 1015-1021.) Cameron asserts that "[o]ther courts have explained that '[t]he *WellPoint* court went on to note, though, that 'the complaint need not identify false statements made by each and every individual,' but rather the plaintiff need only 'identify the role of each defendant in the alleged fraudulent scheme.' *WellPoint,* then, is not necessarily inconsistent with *Stapleton*. And to the extent

---

[1] Defendant Chandler is the Vice President of Environmental Operations at Lone Mountain Land Company and directs environmental compliance for Yellowstone Club and Spanish Peaks properties. (Doc. 35 at 26.)
[2] Defendant Kidd is a principal of Defendant CrossHarbor Capital Partners and President of Defendant Lone Mountain Land Company. Defendant Kidd develops projects including Spanish Peaks, Yellowstone Club, Montage Big Sky, and Big Sky Town Center. (Doc. 35 at 26.)

*WellPoint* is inconsistent, the Ninth Circuit's *Stapleton* decision controls.'" (Doc. 35 at 27 quoting *In re Volkswagen "Clean Diesel" Mktg.*, *Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 U.S. Dist. LEXIS 179652 at *757 (N.D. Cal. Oct. 30, 2017).)

YC Defendants cite a collection of authority from the Ninth Circuit and the District of Montana which holds otherwise, concluding that plaintiffs "must differentiate their allegations when suing more than one defendant." (Doc. 43 at 7 quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).) YC Defendants also note that *In re Volkswagen* merely determined that a defendant could be liable for mail or wire fraud when he did not personally send the fraudulent communication but was still knowingly participating in the fraudulent scheme, had intent to participate, and the fraud occurred within the scope of the scheme. *In re Volkswagen*, No. MDL 2672 CRB (JSC), 2017 U.S. Dist. LEXIS at *757.

YC Defendants assert that nothing in the allegations from Cameron show participation by any of them in falsifying data or sending it to the EPA or DEQ. (Doc. 43 at 9.) The Court agrees. The alleged facts, which the Court will recognize even though they were not alleged in the amended complaint, fail to plausibly allege a RICO violation under either asserted pleading standard. The alleged facts provide no evidence any of the YC Defendants participated in fabricating or sharing fraudulent data.

The only alleged fact that potentially could involve participation in mail/wire fraud are the closed-door meetings between Defendant Edwards and Defendant DuCuennois. Even those allegations cannot possibly be sufficient evidence that YC Defendants were involved in RICO predicate acts. (*See* Doc. 35 at 28 citing Doc. 29 ¶ 176.) Cameron does not allege the closed-door meetings were themselves wrongful. Cameron argues instead that Defendant Edwards and Defendant DuCuennois discussed the alleged fraudulent data sent to EPA and DEQ in the meetings. (*Id*.) Cameron provides no evidence of the alleged content of these discussions. Cameron further asserts that Defendant DuCuennois participated in the RICO violation scheme "by approving new sewer connections at the Big Sky Sewer & Water Plant even though he knew: (1) the data being sent to investigators was fraudulent; and (2) the effluent being sent to Defendant Spanish Peaks and Defendant Yellowstone Club did not meet water quality standards." (*Id*.) This allegation directly conflicts with the Court's previous finding that the data was not fraudulent and with the jury verdict that Defendants had not violated the Clean Water Act. (*See Cottonwood v. Big Sky Water and Sewer District, et al,* CV-20-28-BU-BMM at Doc. 266, Doc. 143.)

Even if the Court were to ignore these previous findings and view the alleged facts as true, that the data was fraudulent, Cameron still fails to provide any evidence that a single YC Defendant actually participated in the creating or sharing of the

data. The Ninth Circuit in *Eclectic Properties* rejected similar tenuous arguments made by the plaintiffs. *Eclectic Properties East*, 751 F.3d. The alleged scheme in *Eclectic Properties* involved defendants buying real estate, conspiring to inflate rental payments, and then selling the properties to plaintiffs for far more than they were worth based on inflated market values. *Id*. at 994. The Ninth Circuit determined that, "although the increase in price is consistent with Defendants' alleged fraudulent intent, it does not tend to exclude a plausible and innocuous alternative explanation." *Id*. at 998. The Ninth Circuit acknowledged that long-term commercial real estate leases typically support increased future property sales, and though the increase in this case was quite large, the "[p]laintiffs plead no facts that would tend to show that this increase was not typical, appropriate, or the product of legitimate market forces." *Id*. The Ninth Circuit reasoned that the plaintiffs had failed to meet their burden "to do '[s]omething more' to 'render [their] allegations plausible within the meaning of *Iqbal* and *Twombly*.'" *Id*. at 999. *Eclectic Properties* further assessed whether the plaintiffs had met their burden of proving the defendants had specific intent to defraud. *Id*. The Ninth Circuit concluded that "[f]ar from establishing a plausible entitlement to relief, Plaintiffs' preferred reading of the complaint requires us to draw '*implausible*' inferences that Defendants had the specific intent to defraud Plaintiffs." *Id*. (emphasis in original).

21

The pleading here suffers the same shortcomings. Cameron's amended complaint fails to plausibly allege a substantive civil RICO claim as to YC Defendants.

II.    Preclusion Doctrines

The Court will not address the application of the preclusion doctrines to this claim given the Court's holdings.

## ORDER

Accordingly, **IT IS ORDERED**:

- Defendant Edwards's Motion to Dismiss (Doc. 31) is **GRANTED.**

- YC Defendants' Motion to Dismiss (Doc. 33) is **GRANTED**.

- Cameron's Amended Complaint is **DISMISSED**.

- The Clerk of Court is directed to close this case.

**DATED** this 9th day of October 2025.


Brian Morris, Chief District Judge
United States District Court